IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 1, 2009 Session

**STATE OF TENNESSEE v. DAMION SEALS**

**Direct Appeal from the Circuit Court for Madison County**
**No. 07-519     Roger A. Page, Judge**

**No. W2008-00793-CCA-R3-CD  -  Filed October 20, 2009**

The defendant, Damion Seals, pled guilty to aggravated assault, a Class C felony, and was sentenced to five years as a Range I offender in the Department of Correction. On appeal, he challenges the sentence imposed by the trial court. After review, we affirm the sentencing decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and CAMILLE R. MCMULLEN, JJ., joined.

M. Brandon Barber, Alamo, Tennessee, for the appellant, Damion Seals.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the defendant's and his brother's, the co-defendant, attack of their step-grandfather, the victim, in May 2007. As a result, the defendant[1] was indicted and pled guilty to aggravated assault with the sentence to be determined by the trial court.

Prior to the guilty plea hearing, the State moved the trial court to exclude, pursuant to Tennessee Rule of Evidence 404(b), any reference to the victim's alleged sexual assault of the defendant's mother, Valerie Seals, on the basis that such assault never occurred. At the hearing on the motion, the defendant testified that on the morning of May 3, 2007, he overheard his

---

[1] This appeal involves only the defendant.

grandmother talking to his uncle on the phone and saying that "[the victim] was fondling and touching on [the defendant's] mother." The defendant heard his uncle admonish his grandmother not to tell him and his brother "because it's not going to be nice," and his grandmother agreed that she would not tell them. The defendant said that he asked his grandmother what was going on, and she "look[ed] like she was in a state of shock [and] said, 'What [do] you mean, what [do] you mean?' Because she was trying to cover up for what [he] heard."

The defendant testified that he then asked his mother and, although she initially did not want to tell him, she admitted that the victim had touched her. The defendant noted that his primary thought was that he needed to get his mother out of the house, and he called the co-defendant. The defendant asked his grandmother if she was going to call the police, to which she responded that she was not going to call the police on her husband. The defendant recalled that the co-defendant arrived at the house, and the two of them waited for the victim. The defendant said that he was afraid his mother would be sexually assaulted again.

On cross-examination, the defendant testified that when they confronted the victim, he initially did not say anything but then asked, "Who told you that?" The victim started yelling at the defendant, raised his fist, and "that [was] when everything happen[ed]."

The co-defendant testified that on May 3, 2007, he received a phone call from the defendant informing him that their mother was being abused. In response, he went to his grandmother's house, and his grandmother told him that the victim had been "fondling" his mother. The co-defendant said that he also asked his mother, and her response made him think it was true. When the victim arrived at the house, the defendant and co-defendant confronted him, but the victim did not give them a response. They asked the victim to leave the house, but he refused. The co-defendant recalled that the victim then "stepped on" the defendant, so the co-defendant hit him. The co-defendant said that they were fearful the victim would assault their mother again.

Laura Rogers, the defendant's grandmother and victim's wife, testified that her daughter, the defendant's mother, had suffered a stroke that left her partially incapacitated. She noted that she often had to question her daughter's response to questions. Rogers denied having a telephone conversation in which she accused the victim of fondling her daughter. She stated that she had a conversation with her son in which she told him she had heard something she did not understand. She elaborated that what she had heard was the defendant talking to his mother, and it sounded like she was telling the defendant that the victim had touched her. Rogers said she had never known the victim to fondle her daughter.

Rogers testified that after she overheard the defendant talking to his mother, she approached the defendant and admonished him to make sure he understood what happened before taking action. The co-defendant arrived at the house during her conversation with the defendant and said, "It's too late, it's too late, it's too late." The defendant and co-defendant both believed that the victim had assaulted their mother. Later that day, Rogers received a call at work that the defendant and co-defendant were beating up the victim.

After the hearing, the court granted the State's motion, finding that the defendant had failed to prove, by clear and convincing evidence, that the inappropriate touching took place. The court also noted that the evidence was not relevant to the issue of defense of another because there was no proof of an immediate threat to the defendant's mother.

The defendant then pled guilty to aggravated assault with the sentence to be determined by the trial court following a hearing. At the sentencing hearing, Diane Jaynes, with the Board of Probation and Parole, testified that she prepared the defendant's presentence report, and it was entered into evidence. Jaynes stated that Roger Wright attempted to submit a victim impact statement on the victim's behalf, but it was not included in the report because it was untimely and her report had already been submitted.

Roger Wright, a victim advocate with the Victim Assistance and Advocacy Project at West Tennessee Legal Services, testified that he helped the victim prepare an impact statement. The statement and the victim's attached medical records were entered into evidence at the hearing.

Laura Rogers, the victim's wife and defendant's grandmother, testified that since the attack, the victim's memory is not as good and he now has high blood pressure. He has to walk with a cane and his vision is worse in one eye. She said that although the victim was seventy-three years old at the time of the attack, he was healthy and worked in a clothing store everyday. She recalled that she overheard a conversation between the defendant and his mother in which there were implications that the victim had sexually assaulted the defendant's mother. Rogers noted that the defendant became upset and his demeanor changed after the conversation.

With regard to the telephone conversation overheard by the defendant, Rogers testified that she was talking about the conversation she overhead the defendant having with his mother; she was not saying a sexual assault had occurred. Rogers said that after her phone conversation, she asked her daughter, in the defendant's presence, if the victim had touched her anywhere, and she replied no. Rogers acknowledged that this was the first time she had mentioned that she had asked her daughter about the touching.

The defendant testified that on the day of the incident, he was asleep in bed when he heard his grandmother talking to his uncle on the phone and telling him that the victim had been touching the defendant's mother. He confronted his grandmother, who gave him a "puzzled" look, and then went to talk to his mother. The defendant recalled that he asked his mother if the victim had touched her, and "she was like, 'Yeah.'" The defendant said that he believed his mother was telling the truth. He stated that he was normally not a violent person and that he assaulted the victim because his mother "showed [him] exactly where [the victim] touched her. And it just -- it hurt."

The defendant stated that he asked the victim why he had touched the defendant's mother, and the victim did not give an answer but appeared angry that the topic had been brought up. The defendant then asked the victim to leave, but he would not. The victim never denied the allegation and asked the defendant, "Who told you that?" The defendant recalled that the victim "balled his

fist up," took a step forward, "then that's when he got hit." The defendant acknowledged that he hit the victim a couple of times once he was on the ground. The defendant said that his intent was to protect his mother.

The defendant was adamant that he overheard his grandmother's conversation before he talked to his mother and that his grandmother's conversation could not have been in response to what she had heard the defendant and his mother talking about. The defendant denied that his mother sometimes made conflicting statements or was led to answer a certain way based on the way a question was asked. The defendant acknowledged that he did not report the victim's alleged touching of his mother to the Department of Human Services until after he was arrested for the aggravated assault.

The co-defendant testified similarly to the defendant with regard to the incident with the victim. He said that he hit the victim when the victim stepped toward the defendant as to hit him, and he hit the victim only that one time. He stated that he and the defendant would not have gone looking for the victim had he not returned home. The co-defendant acknowledged that they did not report the victim's sexual assault of their mother until after they were arrested and released on bond.

Scott Walley, a social counselor with the Department of Human Services, testified that he investigated the alleged sexual battery of the defendant's mother and concluded that the allegations were unfounded. Walley said that he talked to the defendant's mother during the course of his investigation and there were a number of inconsistencies in her answers. He explained that sometimes she said the victim touched her, and then a few minutes later she said nothing happened. Walley stated that the defendant told him he had confronted the victim and the victim repeatedly denied touching the defendant's mother. Walley said that the defendant never mentioned that he had asked the victim to leave the house. Walley noted that some of what the defendant told him was contrary to the defendant's testimony at the sentencing hearing.

## ANALYSIS

The defendant challenges the sentence imposed by the trial court. Specifically, he asserts that the court erred in its application of some enhancement factors and refusal to award any mitigation. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses; (h) any statements made by the accused in his own behalf; and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

As a Range I offender convicted of a Class C felony, the defendant faced a potential sentence of three to six years. Tenn. Code Ann. § 40-35-112(a)(3). The trial court enhanced the defendant's sentence based on a finding that he had a prior history of criminal convictions, id. § 40-35-114(1), that the defendant was a leader in the commission of the offense, id. § 40-35-114(2), and that the victim was particularly vulnerable due to his age compared to the defendants. Id. § 40-35-114(4). The court placed only slight weight on the victim's particular vulnerability. The court applied the mitigating factor that the offense was committed under such unusual circumstances that it was unlikely a sustained intent to violate the law motivated the conduct, id. § 40-35-113(11), even though it found by a preponderance of the evidence that the sexual assault did not take place. As such, the trial court sentenced the defendant to five years in the Department of Correction.

The defendant challenges the trial court's enhancement of his sentence based on a finding that he was a leader in the commission of the offense, id. § 40-35-114(2), arguing that the co-defendant was the one who escalated the incident by throwing the first punch. As evidence that the defendant was a leader, the testimony showed that the defendant was the one who started the inquiry into the alleged sexual assault of his mother and called the co-defendant to inform him of what had happened. Although the testimony of the defendant and the co-defendant at the motion in limine and sentencing hearings indicates that the co-defendant threw the first punch, the transcript of the guilty plea hearing[2] indicates otherwise. The transcript reflects the following in the State's recitation of facts: "[The co-defendant] grabbed [the victim] and [the defendant] struck him in the right eye with

---

[2] The State submitted that the guilty plea hearing transcript was not made a part of the record on appeal. However, it was made exhibit five at the sentencing hearing and is contained in the record before us.

his fist. That was the first blow." Soon thereafter, the trial court asked the defendant if the facts were correct to which he responded in the affirmative. In any event, even if the defendant did not throw the first punch, "enhancement for being a leader in the commission of an offense does not require that the defendant be the sole leader but only that he be 'a' leader." State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). The evidence shows that the defendant's investigation and getting his brother involved was what instigated the assault. As such, we cannot conclude that the trial court abused its discretion.

The defendant also argues that the trial court erred in enhancing his sentence based on a finding that the victim was particularly vulnerable because of age. See Tenn. Code Ann. § 40-35-114(4). The State argues that the factor was properly applied due to the fifty-year disparity in the age of the defendant and the victim. With regard to this factor, we note that the State bears the burden of establishing that a victim is particularly vulnerable due to age or physical or mental disability. State v. Walton, 958 S.W.2d 724, 729 (Tenn. 1997). Our supreme court has noted that a victim's "age alone may have little or no bearing on size, strength or vitality." State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997). The court continued that "unless the State produces evidence of physical or mental limitations at the time of the offense, along with proof of the victim's age, it cannot be presumed that the victim was *particularly* vulnerable based solely on [his] age." Id.

This court has upheld the enhancement of a sentence where the victim was physically small in size, and therefore particularly vulnerable, in comparison to the defendant. See State v. William Ray Rhodes, No. 02C01-9406-CC-00124, 1995 WL 425046, at *6 (Tenn. Crim. App. July 19, 1995), perm. to appeal denied (Tenn. Nov. 27, 1995). A correlation could arguably be drawn from the difference in a victim's and defendant's stature to a disparity in ages. In fact, our research has revealed at least one situation where this court upheld the application of this enhancement factor due to the disparity in age between the victim and defendant. See State v. Robert Beachboard, No. 03C01-9302-CR-00041, 1993 WL 350169, at *2 (Tenn. Crim. App. Sept. 15, 1993). However, that case was prior to Poole, and the evidence in this case presented at sentencing established that the victim, although in his seventies, was healthy and still performing rather physical work at the time of the incident. There was no proof that the defendant had any infirmity, other than age, that rendered him particularly vulnerable. In any event, the trial court only gave this enhancement factor slight weight. Therefore, in light of the two other properly applied and more heavily weighed factors, any misapplication of this factor does not alter the defendant's sentence.

The defendant also argues that the trial court failed to consider his state of mind as mitigation evidence. He specifically contends that the mitigating factors that he was motivated by a desire to provide necessities for his family, Tenn. Code Ann. § 40-35-113(7), and that the offense was committed under such unusual circumstances that it was unlikely a sustained intent to violate the law motivated the criminal conduct, id. § 40-35-113(11), were applicable to his circumstance because he was acting under the belief that a sexual assault of his mother had taken place. We note that the trial court, although finding that the assault did not occur, "g[a]ve [the defendant] the benefit of the doubt" and, in its discretion, did award some mitigation based on the "unusual circumstances" of the offense."

Moreover, the record supports the trial court's decision not to grant mitigation based on the defendant's motivation being a desire to provide necessities, namely safety, for his family. The evidence shows that once the co-defendant arrived at the house, he and the defendant waited for approximately another twenty minutes before the victim arrived – a time period during which the defendant instead could have removed his mother from the house or called the authorities. In the alternative, the defendant chose to confront and ultimately attack the victim. Furthermore, the defendant's testimony at sentencing seemingly suggests that the attack was motivated by revenge. Specifically, the defendant was asked why the incident happened, and he responded, "The reason the incident with [the victim] [happened] was my mother, she showed me exactly where [the victim] touched her. And it just -- it hurt." Thus, we conclude that the trial court acted within its discretion in declining to grant mitigation on this basis.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the sentencing decision of the trial court.

_____
ALAN E. GLENN, JUDGE